IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02649-RM-NRN

CELESTE T. ARCHER,

Plaintiff,

v.

KIMBERLYN COOK, in her individual capacity
LACEY KLINDT, in her individual capacity, and
ELEANORE LEWIS, in her individual capacity,

Defendants.

---

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDMENT COMPLAINT
(Dkt. ##24 & 29)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

## 1. Introduction

As I have noted more than once during hearings in this case, "there are mountains and then there are molehills." Plaintiff Celeste Archer and her lawyers are trying to turn the latter into the former by making a federal constitutional lawsuit out of a two hour inconvenience.

In September 2021, Ms. Archer received a notice under the University of Colorado Denver's (the "University" or "CU Denver") COVID-19 safety protocols. The notice was based on an inaccurate COVID-19 report which indicated Ms. Archer was the source of a COVID-19 exposure. The notice included a directive that she stay away from the University's campus pending communication with a member of the contact

tracing team. Two hours later, after Ms. Archer complained and made clear she was vaccinated and not suffering any symptoms, the directive was reversed.

Ms. Archer and her lawyers now claim that her supposed property interest in being able to go to the office was infringed because the University's directive to avoid campus was issued without an allegedly constitutionally mandated pre-deprivation hearing. This is so, even though as soon as Ms. Archer heard about the directive, she communicated with the contact tracer listed on the notice and quickly had the directive reversed. Ms. Archer could have gone into the office that same afternoon, but decided she was too upset to go in, even over the weekend. Reciting even these skeletal allegations underscores the patent absurdity of the constitutional claim being made here. In addition to the constitutional claim against the contact tracers who sent out the directive, Ms. Archer brings a state law claim for outrageous conduct against the person who made the false report, Ms. Eleanore Lewis.

Defendants have moved to dismiss, arguing that there was no constitutional violation and that the defendant employees have immunity from suit, both under the doctrine of qualified immunity and, with respect to one state law claim against Ms. Lewis, pursuant to Colorado's Governmental Immunity Act ("CGIA").

Based on the allegations of the Second Amended Complaint (Dkt. #21), I find there was no constitutional violation. Not every arguably wrongheaded employment decision by a governmental entity violates the United States Constitution. And in this case, a directive that an employee not come to work for the afternoon, based on a suspicion of COVID-19 exposure, with zero other effects on her job (such as a reduction in pay or change in job responsibilities), does not deprive that employee of any

constitutionally protected property right. In addition, to the extent there was any deprivation at all, Ms. Archer had a meaningful and prompt post-deprivation way of addressing the issue—she contacted the person listed on the notice and cleared up the misunderstanding. And, even if there were an arguable constitutional violation here, Defendants Kimberlyn Cook and Lacey Klindt, who were the contact tracers, have qualified immunity from suit because the claimed right is not clearly established. There is no Supreme Court or Tenth Circuit decision putting a reasonable official on notice that the conduct in this case violated the Constitution. Ms. Archer's federal claim should be dismissed with prejudice.

Absent the continued existence of any federal claim, the sole remaining claim is the state law claim for outrageous conduct. This Court could decline to exercise supplemental jurisdiction over this claim. *See Ball v. Renner,* 54 F.3d 664, 669 (10th Cir. 1995) (explaining that the "most common response" to a pretrial disposition of federal claims has been to dismiss a remaining state law claim without prejudice, absent compelling reasons to the contrary). However, the question of whether the outrageous conduct claim against Ms. Lewis should survive has been fully briefed and it would be an unnecessary expense and prolongation of this litigation to not decide the issue at this time. Dismissing without prejudice merely to allow Ms. Archer to refile in state court and force all parties to make all the same arguments again in another forum would not be in the interests of justice, nor would it be consistent with Rule 1.

With respect to the state law claim, I conclude that Ms. Lewis's report of COVID-19 symptoms/exposure (whether false or not) was part of the Ms. Lewis's duties as a University employee. Because the report of COVID-19 exposure fell within the scope of

the scope of her employment, the claim against Ms. Lewis for wrongful reporting (allegedly constituting outrageous conduct) comes under the notice requirements of the CGIA. Ms. Archer did not give the required notice under that Act and therefore this Court lacks jurisdiction to hear that claim. Normally, the Court's lack of subject matter jurisdiction for failure to comply with the CGIA notice requirements results in dismissal without prejudice. However, where the time has lapsed to file the notice and the pleading defect therefore cannot be cured even in state court. I also find that, even if Ms. Archer's allegations are accepted as true, a single intentional false report that a co-worker is spreading COVID-19 does not reach the extreme level of behavior needed for the tort of outrageous conduct in Colorado. The state court claim should be dismissed for this reason as well.

### 2. Conversion of the Motion to Dismiss (Dkt. #24) to a Motion for Summary Judgment

Because the parties referenced documents and stipulations not contained in the Second Amended Complaint in the briefing on the Motion to Dismiss filed on behalf of all defendants (Dkt. #24), I elected to convert this Motion to Dismiss to a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(d). I gave the parties the opportunity to submit additional affidavits or documents in support of their respective positions as to whether Ms. Archer has adequately stated a constitutional claim and whether the Court has jurisdiction over the state law claim. *See* Dkt. #50. Defendants declined to provide additional documentation or affidavits, taking the position that there was no need to convert the Motion to Dismiss to a Motion for Summary Judgment because the Court is entitled to take judicial notice of certain matters outside the pleadings without conversion. *See* Dkt. #53. Ms. Archer, for her part, provided an affidavit and other

materials. *See, e.g.*, Dkt. #54-1 (Archer Declaration); Dkt. #54-2 (September 6, 2021 E-mail Blast); Dkt. #54-3 (Deposition transcript excerpts). Ms. Archer also incorporated other materials that had previously been submitted in connection with her opposition to the Motion to Stay Discovery. These included Dkt. #34-1 (Defendant's Answers to Plaintiff's First Requests for Admission); Dkt. #34-2 (e-mail chain including statement by associate University counsel that "[n]o one should have said you were excluded from campus. They were moving way too fast."); Dkt. #34-4 (e-mail of September 3, 2021 directing Ms. Archer not to come to campus); Dkt. #34-5 (e-mail of September 3, 2021 to Ms. Archer's supervisor saying, "Celeste Archer is unable to be physically present on campus at this moment"); and Dkt. #34-6 (e-mail of 9/3/2021 from Kimberlyn Cook saying, "I have spoken with Celeste, and would like to let everyone know that she has been cleared to return to campus, effective immediately.").

### 3.  Factual Background

Plaintiff Celeste Archer is the Executive Director of the University of Colorado Denver's National History Day in Colorado program, and "a mainstay in the Denver education community." Dkt. #21 at 1. Ms. Archer serves on numerous boards, such as the National Conference of Governor's Schools, and has received myriad awards, including being named the 2019 Defender of Democracy by the Denver League of Women Voters. Ms. Archer has served as a teacher in schools and universities in Houston and Denver for over 25 years. Ms. Archer also serves as Executive Director of the Colorado Student Leaders Institute, based at CU Denver.

On September 1, 2021, Ms. Archer was not in Colorado. She was in Texas. Dkt. #54-1 ¶ 10.

On September 3, 2021, a week before National History Day's showcase event for which Ms. Archer was responsible (scheduled for September 10, 2021), while en route to her CU Denver office, Ms. Archer received an e-mail notice that, based on an anonymous report, she had been exposed to COVID-19, and was directed to stay away from the CU Denver campus pursuant to its COVID-19 protocols. The notice read as follows:

> Hello,
>
> The Contact Tracing Team has received notification that you have either been exposed to COVID 19, tested positive for COVID-19, Or [sic] having symptoms related to COVID-19.
>
> > **If you are a University Staff, Student or Faculty you MUST fill out this <u>self-report form [. . .]</u> Please do not come to campus.** A contact tracer will reach out to you about next steps and returning to campus (if you are symptomatic or positive for COVID 19). Please remain off campus until you are cleared by your contact tracer to return.
>
> For any **self-report questions,** please e-mail Lacey Klindt at <u>LACEY.KLINDT@CUANSCHUTZ.EDU</u> and <u>KIMBERLYNCOOK@CUANSCHUTZ.EDU</u>.
>
> For any **medical questions** regarding COVID 19, please call your health care provider.
>
> Thank you,
>
> Kimberlyn Cook
> Occupational Health I Environmental Health and Safety

Dkt. #21-2 ("COVID-19 Notice") (emphasis in original).

Per the Second Amended Complaint, this exclusion notice originated when, at 11:18 a.m. on September 3, 2021, Defendant Lewis had submitted a form stating that she had COVID-19 symptoms that had begun the day before. Later that same day, Defendant Lewis provided answers on an Initial Symptom Check document. *See* Dkt.

#21-6. In that form, Ms. Lewis named Ms. Archer as the work colleague who had COVID-19 and who had exposed Ms. Lewis to the virus. *Id.*; Dkt. #21 ¶ 34. The Initial Symptom Check form also reported, incorrectly, that Ms. Archer was unvaccinated. Dkt. #21-6 at 4.

Defendant Kimberlyn Cook and Lacey Klindt are students and employees of CU Denver who were part of the "tracing team" assigned to contact individuals suspected to be the source of a COVID-19 infection. Dkt. #21 ¶ 14. Based on Ms. Lewis's incorrect report, the tracing team sent the COVID-19 Notice to Ms. Archer directing her to stay off campus.

Ms. Archer alleges that Defendants Cook and Klindt would have known of the transparent falsity of Ms. Lewis's report after just a "cursory review" because (a) University records would have disclosed Ms. Archer's vaccination status; (b) Ms. Lewis's supposedly fake exposure date (September 1) and her date of the onset of symptoms (September 2) were impossibly close together; (c) an individual does not generally know how they contracted COVID-19, such as when a person passes another person in the "hallways [or] bathroom"; (d) Ms. Lewis and Ms. Archer do not in fact work together in a "shared work room"; and (e) Ms. Lewis would not know, one way or another, whether Archer "walked all over the floor." *Id.* ¶ 42.

It is further alleged that the University easily could have learned whether Ms. Archer was even in the office on September 1, 2021. *Id.* ¶ 43. Per the Second Amended Complaint, Ms. Lewis's false report was so transparently a hoax that Defendants Klindt and Cook should have immediately recognized it as such. Id. at ¶¶ 41–42.

But instead of treating the report as false, Defendants Klindt and Cook, "acting under color of state law," sent the COVID-19 Notice e-mail. *Id.* ¶¶ 45–47.

The gist of Ms. Archer's Second Amended Complaint is that she was given no opportunity to be heard before the campus ban was implemented. She also received no chance to be heard before her ban was publicized to her supervisors and co-workers. This is because at essentially the same time that she received the message that she was banned from campus, the tracing team sent a parallel e-mail message to Ms. Archer's supervisor and other colleagues stating,

> Celeste Archer is unable to be physically present on campus at this moment. You will be notified once your employee is cleared to return to work. . . . If this employee can work from home, they may do so with your approval. This employee may not be physically present at any CU Denver or CU Anschutz facilities until they are cleared to physically return to campus.

Dkt. #21-3.

On receipt of the "ban" via the COVID-19 Notice, Ms. Archer then "immediately" contacted and spoke to Ms. Cook (whose e-mail address was provided on the COVID-19 Notice). *See* Dkt. #21-7. Ms. Archer explained she did not have COVID-19 and was vaccinated. Ms. Archer followed up with an e-mail to Ms. Cook saying, "Thank you for the conversation. I have just received this. Please send the rescinding e-mail immediately. To say that I am shocked is an understatement. Basing public health decisions on hearsay is a slippery slope at best. I will be escalating this situation appropriately." Dkt. #34-2 at 1–2.

Two hours and four minutes after the original COVID-19 Notice, Defendant Cook sent out a rescinding e-mail to Ms. Archer's supervisors and copied Ms. Archer saying, "Hello, I have spoken with Celeste, and would like to let everyone know that she has

been cleared to return to campus, effective immediately. Please let me or my supervisors know if you have any questions. Thank you." Dkt. #34-6.

Upset about being "banned" from campus without anyone first having contacted her, Ms. Archer sent an e-mail complaining of her treatment to Chris Puckett, Managing Associate University Counsel, and Special Assistant to the Chancellor for COVID-19. Dkt. #34-2. Ms. Archer's e-mail to Mr. Puckett, which included a copy of the COVID-19 Notice reads:

> FYI.
>
> We need to have a conversation. This is not ok. The fact that this was based on someone saying they heard that I might have tested positive harkens to a very dark history.
>
> Look forward to clearing this up.
>
> Celeste.

Dkt. #34-2.

Mr. Puckett responded promptly with his view that the exclusion should not have happened: "I checked with our team and we are changing our process and communications. No one should have said you were excluded from campus. They were moving way too fast." Dkt. #21-8. Mr. Puckett further explained that the communications process would be changed so that no one is excluded without "clear verification":

> We do receive reports from all over the place and reach out to figure out what's going on. They're changing their communications to be clear that the team has received a report, that may not be accurate, but indicates that there may be a COVID exposure etc [sic] and we need to follow up. I'm sorry that it moved so quickly, we need to slow that down. No one should be excluding folks from campus without a clear level of verification and information.

*Id.*

The following Tuesday, September 7, 2021, Ms. Archer sent another e-mail, this time to Heidi Ganahl, a member of the University of Colorado's Bord of Regents. *See* Dkt. #21-7. The e-mail reads,

> On Friday, I was alerted that I was not allowed on campus because it had been reported that I had tested positive for COVID. I immediately reached out to the person who originated the e-mail. First, she is a student working in the office. Second, it turns out that "they had heard from someone who had heard that I had tested positive or might have been exposed." This very serious situation was entirely based on hearsay, without me never [sic] having been contacted until I received this e-mail. And I received this e-mail after up 4 or 5 others had received it.
>
> I forwarded my reply to the e-mail to Chris Puckett, as seen below, and his reply is appreciated but not complete or satisfactory. That the university would create this sort of conversation and base public health decisions on rumor, and that a student would hold that power, is disconcerting to say the least. I felt like you should and would want to know. I will forward the other conversation streams as well.

*Id.*

Notwithstanding the relatively calm and professional tone of her e-mails to Ms. Cook and Mr. Puckett, Ms. Archer today claims that the "trauma" from the experience of "being targeted for COVID-19 discrimination," combined with the "summary exclusion from campus without due process" and the refusal of the University to tell her who had named her as a COVID-19 spreader, caused her to be unable to go in to work that Friday, or Saturday, or Sunday. But, ultimately, "due to the needs of preparing for the September 10 showcase," she was able to come to work on Monday, September 6, 2021. Dkt. #54-1 ¶ 11.

Ms. Archer's claimed emotional distress from this incident is alleged to have been exacerbated by the University's continued employment of the person, Ms. Lewis, who falsely reported Ms. Archer as having been exposed to COVID-19. Dkt. #21 ¶ 11.

Ms. Archer's hypothesizes that Ms. Lewis targeted her with the false report as part of "campaign of harassment," due to some work conflicts between Ms. Lewis and Ms. Archer dating back six years, when Ms. Lewis previously had worked on National History Day Colorado with Ms. Archer. Dkt. #54-1 ¶¶ 18–20. In Ms. Archer's view, the harassment campaign only succeeded because of the University's flawed COVID-19 alert system.

### 4.  The Thin Foundation of Ms. Archer's Constitutional Claim

Ms. Archer's claim that the University somehow violated her constitutional rights is based entirely on a two hour and four-minute period on a Friday afternoon in September when she was told not to come to campus. The problem was cleared up immediately after Ms. Archer spoke to the person who had sent the COVID-19 Notice.

Ms. Archer claims that as a public employee, she holds a property interest in her public employment, in part because her employment may only be modified or terminated for a limited set of reasons, and she is entitled to notice before any such modification or termination occurs. *Id.* ¶ 21. She insists that in her capacity as Executive Director of the Colorado Student Leaders Institute ("COSLI"), she is entitled to "generally unfettered access to campus," and notes that her badge allows her to enter her building and office at any time, even outside of normal work hours. Dkt. #54-1 ¶ 25. She further claims that had she not been barred from campus, she had planned to work extensively on National History Day Colorado for the upcoming program; she also planned to work on a COSLI issue for an event that was scheduled to occur in October. *Id.* ¶ 26.

Ms. Archer's claim is not that the University failed to provide a mechanism to challenge or dispute the ban, but rather that her property interest in doing her work for the National History Day Colorado and COSLI was so significant that she was entitled to a pre-deprivation hearing. Ms. Archer insists that her exclusion from campus without notice and a hearing, even for a short period of time, constituted a violation of her constitutional rights. *See* Dkt. #21 ¶ 25 (asserting Ms. Archer possessed a protected interest such that due process protections were applicable); Dkt. #54-1 ¶ 29 ("Whether robbed of the protections of our Constitution for five seconds or five lifetimes, the importance of due process is bedrock.").

### 5.  Ms. Archer's Claims for Relief

Ms. Archer brings two claims for relief. First, she brings a claim under 42 U.S.C. § 1983 against the COVID-19 tracers, Kimberlyn Cook and Lacey Klindt, alleging a violation of Ms. Archer's Fourteenth Amendment right to procedural due process. Dkt. #21 ¶¶ 53–56. The claim centers on the contention that Defendants Cook and Klindt violated Ms. Archer's due process rights by "blocking her from campus" without first giving her a hearing. *Id.* ¶ 56. It is notable that Ms. Archer does not sue the University itself while much of her complaint centers on the University's COVID-19 policy or its implementation. Of course, she cannot sue the University for injunctive relief because as soon as she complained, the University changed its policy to ensure that no one was banned from campus without prior verification. Instead of suing the University, Ms. Archer has chosen to sue the two contract tracer employees who were merely implementing the policy.

The second claim for relief is a state law outrageous conduct claim against Defendant Lewis. Ms. Archer alleges that, by making an intentional false report that Ms. Archer had exposed Ms. Lewis to COVID-19, just one week before National History Day, Ms. Lewis engaged in "extreme and outrageous conduct," recklessly or with the intent of causing Ms. Archer severe emotional distress, and actually caused her severe emotional distress. *Id.* ¶ 58–59. Ms. Archer's alleged distress includes "ongoing anxiety, fear of future incidents involving Defendant Lewis, and an inability to change her medications in the manner she desires." *Id.* ¶ 61.

### 6. Defendants' Motions to Dismiss

All three Defendants have moved to dismiss. *See* Dkt. ##24 & 29. The contact tracers, Defendants Cook and Klindt, challenge Ms. Archer's constitutional claim arguing that (1) as an at-will employee, Ms. Archer had no constitutionally protected interest in moving freely on or having "unfettered access to" the CU Denver campus, but (2) even if she did, she was provided the opportunity to be heard after the initial notice of the ban. In addition, Defendants Cook and Klindt argue that they have qualified immunity from this constitutional claim because the constitutional right infringed, if it was a right, was not clearly established by either Supreme Court or Tenth Circuit case law.

For her part, Defendant Lewis, who allegedly made the false COVID-19 report, moves to dismiss for lack of subject matter jurisdiction on the ground that she was a University employee acting withing the scope of her employment at the time she made the allegedly false report. As such, she asserts she is protected by the CGIA. Under the CGIA, Ms. Archer's claim is barred unless she filed a written notice of the claim within one hundred eighty-two days after the date of the discovery of the injury. Colo. Rev.

Stat. § 24-10-109(1). Defendant Lewis argues that because no CGIA notice was provided, the Court is deprived of subject matter jurisdiction over the action. *See* Dkt. #29 at 3. Defendant Lewis also moves to dismiss on the ground that Plaintiff has failed to sufficiently allege a claim of outrageous conduct under Colorado law. Dkt. #24 at 18–19**.**

### 7.  Standard for Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hull v. Dutton*, 935 F.2d 1194, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.*

at 679–81. Second, the court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 679.

However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, the Court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claims and matters of which a court may take judicial notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Publicly filed court records, including court transcripts, are subject to judicial notice. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

**8. Standard for Summary Judgment**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

The moving party bears the initial responsibility of providing the court with the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations

contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *see also Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005). However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### 9.  Standard for Motion to Dismiss for Lack of Jurisdiction under Rule 12(b)(1)

The Federal Rules of Civil Procedure instruct that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3); *Marcus v. Kan. Dep't*

*of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999). "[F]ederal courts are courts of limited jurisdiction," so the Court must have a statutory basis to exercise its jurisdiction. *Montoya* , 296 F.3d at 955. Statutes conferring subject matter jurisdiction on federal courts are to be strictly construed. *F. & S. Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

Pursuant to Rule 12(b)(1), a party may bring either a facial or factual attack on subject matter jurisdiction, and a court must dismiss a complaint if it lacks subject matter jurisdiction. See *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 n.4 (10th Cir. 2015). For a facial attack the Court takes the allegations in the complaint as true; for a factual attack, the Court may not presume the truthfulness of the complaint' s factual allegations and may consider affidavits or other documents to resolve jurisdictional facts. *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1272 n.1 (10th Cir. 2012) (citing *Holt v. United States*, 46 F.3d 1000, 1002– 03 (10th Cir. 1995)).

**10. Section 1983 and Qualified Immunity**

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quotations omitted).

In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985). The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory right*s. Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). Once a defendant has asserted a defense of qualified immunity, the burden shifts to the plaintiff who must establish that (1) the defendant violated a right, and (2) the right was clearly established. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). Failure on either element is fatal to the plaintiff's claims. *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011). "In their discretion, courts are free to decide which prong to address first in light of the circumstances of the particular case at hand." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (quotation omitted).

In evaluating whether a claimed right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she had violated that right. *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir.2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" *Lobozzo v. Colo. Dep't of Corrs.*, 429 F. App'x 707, 710 (10th Cir. 2011) (unpublished) (quoting *Zweibon v. Mitchell*, 720 F.2d 162, 172–73 (D.C. Cir. 1983)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight

of authority from other courts must have found the law to be as the plaintiff maintains."

*Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

The Supreme Court has explained that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)). The Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. The level of generality at which the legal rule is defined is important because qualified immunity shields government employees who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officials or government employees from the sometimes "hazy border[s]" of the law. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

### 11.  Analysis

####    a.  Ms. Archer's § 1983 Claim against the two contract tracers should be dismissed.

Defendants Cook and Klindt have moved for dismissal based on qualified immunity. I initially find that Ms. Archer has failed to show the violation of any constitutional right.

In the context of a claimed due process violation, this is itself a two-part inquiry. One, did Ms. Archer have a legitimate state-created property (or liberty) interest in "going to the office" or being allowed "unfettered access" to the University campus? And next, even if Ms. Archer did possess such a property or liberty interest, was Ms. Archer denied the appropriate level of process when directed to avoid campus due to a reported COVID-19 exposure? *See Rooker v. Ouray Cty.,* 504 F. App'x 734, 736 (10th Cir. 2012) (explaining that to assess an alleged procedural due process violation, the court should engage in a two-step inquiry: "(1) did the individual possess a protected interest such that the due process protections were applicable; and if so, then (2) was the individual afforded an appropriate level of process").

First, I find that Ms. Archer had no protected property interest in "going to the office" that merited due process protection. And to the extent she had any protected interest, I find that neither the existence of the interest nor the right to a pre-deprivation hearing was so clearly established that it would have been clear to Defendants Cook and Klindt that they were infringing on Ms. Archer's constitutional rights by asking her to stay away from campus pending communication with a contact tracer.

Context is important. Here, the contact tracers were part of the University's response to the unprecedented circumstance of a global pandemic and an effort to

protect the University, its employees, and students from further spread of a deadly virus. As Chief Justice John Roberts explained in 2020, COVID-19 is "a novel severe acute respiratory illness that has killed thousands of people in California and more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsome*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief).

Second, Ms. Archer did, in fact, receive an appropriate level of due process. Having been informed that Ms. Archer was the source of an exposure, the contact tracers sent out a directive that Ms. Archer not come to campus until she had been in touch with, and cleared by, a contact tracer. As the COVID-19 Notice said, "A contact tracer will reach out to you about next steps and returning to campus (if you are symptomatic or positive for COVID 19). Please remain off campus until you are cleared by your contact tracer to return." The COVID-19 Notice provided the names and e-mails of the contact tracers, with whom Ms. Archer immediately communicated. Ms. Archer was able to quickly clear up the matter in that conversation by clarifying that she was not experiencing symptoms, she was not on campus on the date of the alleged exposure, and she was fully vaccinated. Ms. Archer was allowed to return to campus in just over two hours.

Even if Ms. Archer had successfully identified a constitutional violation, she has failed to meet her burden to show that the right was clearly established. Specifically, she must show that, in these unique circumstances, the contact tracer's directive that she

not come to campus for a short period of time, without providing a pre-deprivation

hearing, constituted a deprivation of a legitimate property interest without due process.

### i. Ms. Archer has failed to show that the Defendants violated any constitutional right.

The first question is whether Ms. Archer had any protectible property interest in

either coming to the office or having physical access to campus that merited due

process protection. The answer is "no."

Ms. Archer insists that she has an interest in "continued employment" that

constitutes a protectible property interest. Dkt. #48 at 5. Quoting *Darr v. Town of*

*Telluride*, 495 F.3d 1243, 1251 (10th Cir. 2007), Ms. Archer explains that a Colorado

state employee may possess a property interest in public employment if "she has

tenure, a contract for a fixed term, an implied promise of continued employment, or if

state law allows dismissal only for cause or its equivalent." Dkt. #48 at 5. *See also Goss*

*v. Lopez*, 419 U.S. 565, 573 (1975) (explaining that "a state employee who under state

law, or rules promulgated by state officials, has a legitimate claim of entitlement to

continued employment absent sufficient cause for discharge may demand the

procedural protections of due process").

Ms. Archer's Second Amended Complaint emphasizes her role as Executive

Director of the University's National History Day in Colorado program. *See* Dkt. #21 at

1, 2, and ¶ 13. It also mentions, in passing, her position as Executive Director of COSLI,

a summer enrichment program for Colorado high school students which seeks to

reinforce the importance of civic engagement. *Id.* ¶ 13. She does not plead that she has

tenure, a contract for a fixed term, a promise of continued employment, or that she may

only be dismissed for cause. Instead, she alleges without any specificity or factual

support, that "her employment may only be modified or terminated for a limited set of reasons." *Id.* ¶ 21.

In opposing Defendants' Motions to Dismiss, Ms. Archer provided no evidence that her position as Executive Director of the University's National History Day was anything other than an at-will position. She therefore had no protected property interest in that role. *Rooker v. Ouray City*, 841 F. Supp. 2d 1212, 1217 (D. Colo. 2012) (finding that an at-will employee does not have a property interest in his continued employment), *aff'd*, 504 F. App'x 734 (10th Cir. 2012). In connection with her COSLI position, Ms. Archer does cite two Memoranda of Understanding ("MOU") between herself and the University's School of Public Affairs. *See, e.g.*, Dkt. #27-5 and #27-6 (Letters dated December 16, 2020 and October 26, 2021). These letters indicate that the University's School of Public Affairs agreed to pay Ms. Archer a monthly amount for serving as Executive Director of COSLI. Both letters contain language stating, "Unforeseen changes in business needs, availability of funds or unsatisfactory performance in this role, may require modification or cancellation of this agreement at any time, in [sic] which you would receive written notice." But the time periods covered by the letters were January 2021 to June 30, 2021 (Dkt. #27-5), and January 2022 to June 30, 2022 (Dkt. #27-6). So, it appears from the face of these MOUs that Ms. Archer had no protected property interest or expectation of continued employment in connection with COSLI in September 2021, when she received the COVID-19 Notice. Ms. Archer in her Declaration claims that her position with COSLI is a year-round job and that the payment is limited to six-month payment period because of issues with the state budget; thus, the dates in the contract are "solely in reference to budgeting and payment, not to

when I am the Director of the COSLI program." Dkt. #51-1 ¶ 22. But that is not what the MOU documents specify. The documents say that Ms. Archer would be paid a certain amount *per month* for *serving* as Executive Director, beginning in January and ending in June. In addition, the COSLI memoranda are clear that "unforeseen changes in business needs" may require "modification or cancellation of the agreement at any time."

The onset and persistence of the pandemic and the need to ensure the safety of the University staff and students could certainly qualify as "unforeseen changes in business needs" that might require an employee to work from home.

But importantly, nothing in the MOUs indicate that Ms. Archer could not be temporarily excluded from her office or from campus. So, there is substantial doubt as to whether Ms. Archer had any protected property interest in either of her positions at the time she was excluded from campus. And Ms. Archer has failed to point to any clearly established law which would have indicated to the contact tracers that by requesting that Ms. Archer stay away from campus for a short period of time, they would be infringing on a protected property interest.

Similarly, even if Ms. Archer did have a protected interest in her *employment*, there is no clear law establishing that a temporary exclusion from campus—with no other impacts on Ms. Archer, such as a reduction in pay or a demotion—would constitute anything more than a *de minimis* deprivation of that interest, which therefore would not implicate due process protections. By example, the law *is* clear that an actual "suspension with pay does not raise due process concerns." *Hicks v. City of Watonga*, 942 F.2d 737, 746 n.4 (10th Cir. 1991); *see also Cleveland Bd. of Educ. v. Loudermill,*

470 U.S. 532, 544–45 (1985) (suggesting that suspension with pay may not raise due process concerns); *Pitts v. Board of Educ. of U.S.D. 305, Salina, Kansas,* 869 F.2d 555, 556 (10th Cir.1989) (holding that suspension of public employee with pay does not invade any measurable property interest); *Taylor v. Nichols*, 409 F. Supp. 927, 935 (D. Kan. 1976) ("[I] t is difficult to perceive any manner in which the plaintiff has been 'deprived of' or 'denied' any cognizable interest in that employment. In the court's mind, a temporary suspension with pay is a far cry from that 'absolute deprivation' against which the Fourteenth Amendment protects."), *aff'd*, 558 F.2d 561 (10th Cir.1977). Similarly, in *Fattaey v. Kan. State Univ.*, No. 15-9314-JAR-KGG, 2017 WL 347500 (D. Kan. 2017), a case involving a state university employee who was instructed to not come to work for the remainder of the year, but would still be paid, the court held that as long as payment continues, there is no protected property interest in merely "the continuation of his job duties." *Id.* at *12.

If Ms. Archer could be fully *suspended* with pay from her job without a hearing without violating due process, then merely excluding her from campus for two hours (pending communication with a contact tracer) could not be a deprivation of a cognizable property interest that implicates due process.

Beyond her claim to a property interest in her employment, Ms. Archer also claims a liberty interest in being able to come to the University campus, an interest which she says should not have been denied without a hearing. For this proposition, Ms. Archer cites, among other cases, to a Colorado Supreme Court case, *Watson v. Board of Regents of University of Cololorado*, 512 P.2d 1162 (Colo. 1973). The *Watson* plaintiff had been denied admission to the University of Colorado, and after his request

26

for reconsideration was denied, he appeared at a dean's home and engaged in threatening behavior, prompting a letter from the university president permanently banning him from all university property. The plaintiff was afforded no opportunity for a hearing by which to challenge the allegations. The Colorado Supreme Court ultimately held that because the University of Colorado had "opened its doors to the public," a non-student's right to access university functions and facilities could not be *permanently* denied without due process of law under the Fourteenth Amendment. *Id.* at 1165. Appropriate process would usually involve an orderly administrative hearing prior to the imposition of the disciplinary action. *Id.* But the Colorado Supreme Court took care to note that a pre-deprivation hearing was not always required. "[W]hen a genuine emergency appears to exist and it is impractical for University officials to grant a prior hearing, the right of non-students to access the University may be suspended without a prior hearing, so long as a hearing is thereafter provided with reasonable promptness." *Id.*

*Watson* is not clear authority applicable to the case at hand for multiple reasons. First, Ms. Archer was not permanently banned; her exclusion was temporary. Second, Ms. Archer did have the ability to communicate with the contact tracers, respond to any questions, and to resolve the problem within a short period of time. This compares to the *Watson* plaintiff, who was afforded no post-deprivation recourse. And finally, *Watson* was not decided in the context of a pandemic involving a potentially deadly virus, which could qualify as an emergency. *See S. Bay United*, 104 S. Ct. at 1613 (Roberts, C.J., concurring). Thus, nothing about the *Watson* decision (which is not binding federal precedent in any event) would have clearly indicated to Defendants Cook and Klindt

that they were violating Ms. Archer's rights. Indeed, the United States Supreme Court and other federal courts have rejected certain aspects of the *Watson* decision. *See Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) ("We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."); *Souders v. Lucero*, 196 F.3d 1040, 1044 (9th Cir. 1999) (affirming dismissal of due process claim in case involving alumnus's claimed access to Oregon State University because plaintiff did not have constitutionally protected interest in having access to the university), *cert. denied*, 529 U.S. 1067 (2000).

Thus, I conclude that Ms. Archer had no protected property or liberty interest in coming to the office or completing her job duties that implicated due process. In addition, no clear law established that she had such a property or liberty interest. Her constitutional claim must fail for these reasons.

### ii. Ms. Archer has failed to show that it was clearly established that she was entitled to a pre-deprivation hearing.

Even assuming it was clear that Ms. Archer had a protected property or liberty interest in coming to campus, it does not follow that it was clearly established that she was entitled to a pre-deprivation hearing under the circumstances of this case. In determining exactly what level of process is required in any given situation, the Supreme Court and Tenth Circuit have directed that a balancing of interests should be conducted:

> Where the government has deprived an individual of a protected interest, we must weigh the following factors to determine whether that individual received due process: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*McDonald v. Wise*, 769 F.3d 1202, 1213 (10th Cir. 2014) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

It is not necessary to decide definitively whether, as a constitutional matter, Ms. Archer was entitled to a pre-deprivation opportunity to be heard before being temporarily excluded from campus. Instead, it is enough to say that the right to a pre-deprivation hearing, in the context of a global pandemic involving a potentially deadly virus, was not so established that a reasonable state employee would have understood that sending the COVID-19 Notice to Ms. Archer *before* first talking to her violated that right.

The private interest here was marginal—the unhindered right to go to the office pending communication with a contact tracer. This was not a substantial deprivation of liberty or property. It did not involve the termination of Social Security benefits, *see Mathews,* 424 U.S. 319, nor the termination of public assistance providing essential food, clothing, housing and medical care. *See Goldberg v. Kelly*, 397 U.S. 254 (1970). This was not a decision severing the rights of parents in their natural child due to claimed neglect. *See Santosky v. Kramer*, 455 U.S. 745 (1982). In the pantheon of potential deprivations of rights, this was, to quote a phrase sometimes used by my colleague Senior Judge R. Brooke Jackson, a "nothingburger."

It may be true that there would have been value to additional procedures, such as being sure to communicate with the alleged COVID spreader prior to sending the exclusion e-mail. But the risk of harm from an erroneous deprivation (missing a few of hours of in-office work) arguably is outweighed by the risk of allowing an infected person

to interact with students or colleagues while the pre-deprivation "opportunity to be heard" is being provided. And the government's interest was undeniably strong. Ms. Archer herself acknowledges that the University "has a substantial interest in protecting public health and preventing the uncontrolled spread of potentially dangerous illnesses." Dkt. #27 at 13. Thus, asking potentially exposed individuals to temporarily stay away from campus pending communication from a contact tracer is not a patently unreasonable approach, nor is it something that has been clearly established as a constitutional violation. This is so, even though the University quickly changed their practices after Ms. Archer's complaint.

Ms. Archer insists that "[p]roviding pre-deprivation notice when an obviously false report is lodged is hardly burdensome." *Id.* But determining whether a self-report by another University employee is "obviously false" is not necessarily an easy task. Ms. Archer says the tracers could have checked her vaccination status or could have verified whether she was even in the state on September 1, 2021. But such verification takes time. In light the uncertainty and fear about COVID transmission, a "better safe than sorry" approach of first sending the COIVD-19 Notice and then granting a speedy post-deprivation audience via telephone or e-mail communication with the contract tracer was not a patently unconstitutional method, and neither the Tenth Circuit nor the Supreme Court has declared it to be.

Finally, Ms. Archer argues that since the University's counsel stated, "No one should have said you were excluded from campus. They were moving way too fast," it is essentially an admission that the contact tracers acted unconstitutionally, and qualified immunity should not apply. *See* Dkt. #27 at 14. But it is no such thing. The fact that a

trained lawyer may have recognized the arguable impropriety of sending out the COVID-19 Notice without first talking to the intended recipient is not a concession that a mere employee would have recognized the supposed constitutional illegality of the conduct "in light of clearly established law." *Elder v. Holloway*, 510 U.S. 510, 512 (1994). Indeed, as described above, no clearly established law made it apparent that asking Ms. Archer temporarily to not come onto campus was a deprivation of any protected property interest. And no clearly established law made it clear that before excluding (temporarily) from campus a person thought to be spreading a deadly disease, the contact tracers first had to grant a pre-deprivation audience, as opposed to speaking with the person afterwards.

Because, under the doctrine of qualified immunity, state employees are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the civil rights claim against Defendants Cook and Klindt should be dismissed on qualified immunity grounds.

> **b. Ms. Archer's claim of outrageous conduct against Ms. Lewis should be dismissed.**
>
> > **i. Plaintiff's tort claim fails against Ms. Lewis because Ms. Archer did not provide a timely CGIA notice, and therefore this Court lacks jurisdiction to hear the claim against her.**

Ms. Lewis has moved to dismiss Ms. Archer's state court claim on the ground of governmental immunity. *See* Dkt. #29. Under the CGIA, before any tort claim may be brought against a public entity or its employees for an act or omission occurring during the performance of the employee's duties and within the scope of her employment, the person claiming to have suffered the injury "shall file a written notice as provided in this

section within one hundred eighty-two days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury." Colo. Rev. Stat. § 24-10-109(1). The notice provisions of the CGIA apply when a federal court hears Colorado tort claims under its supplemental jurisdiction. *Aspen Orthopaedics & Sports Med., LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 838 (10th Cir. 2003).

To satisfy this notice requirement, a plaintiff must strictly comply with the 182-day requirement under § 24-10-109(1), and substantially comply with the contents of the notice under §§ 24-10-109(2) and (3). *See Finnie v. Jefferson Cnty. Sch. Dist. R-1*, 79 P.3d 1253, 1255-56 (Colo. 2003). Failure to timely comply with the notice requirement deprives the Court of subject matter jurisdiction over the action, and "shall forever bar any such action." Colo. Rev. Stat. § 24-10-109(1); *see also Finnie*, 79 P.3d at 1256 (provision requiring written notice be submitted within specified time is "a jurisdictional prerequisite to suit that therefore requires strict compliance with its terms"); *Aspen Orthopaedics & Sports Med., LLC,* 353 F.3d at 839 (failure to provide the written notice of a demand for money damages within the designated time after they discovered or should have discovered, their injury, "operates as a jurisdictional bar to the lawsuit"). Section 24-10-109(1) is not subject to equitable defenses such as waiver, tolling, or estoppel. *Id.* at 839–40.

The University is a "public entity" within the meaning of the CGIA. *See Univ. of Colo. v. Booth*, 78 P.3d 1098, 1101–02 (Colo. 2003). Ms. Lewis, as an employee of the University, is a public employee. Colo. Rev. Stat. § 24-10-103(4)(a); *see also Fine v. Tumpkin*, 330 F. Supp. 3d 1246, 1252 (D. Colo. 2018) (holding that University of

Colorado coach, athletic director, chancellor, and president were "public employees" within meaning of CGIA).

Ms. Archer did not file a CGIA notice within the time specified by the statute. *See* Dkt. #29-1 (Declaration of paralegal Linda Ruth Carter explaining that, as of March 8, 2022, "[n]o notice of claim has been received by the Office of University Counsel, the Office of the Board or Regents of the University of Colorado, or the Office of the Attorney General related to Plaintiff's claims in the above captioned matter").

Ms. Archer, for her part, argues that she substantially complied with the CGIA notice requirement by sending the e-mail of complaint to University counsel and another e-mail on September 7, 2021 to a member of the University's Board of Regents, Ms. Heidi Ganahl. *See* Dkt. #21-7. I disagree that any of Ms. Archer's e-mails satisfy the jurisdictional notice requirement. Specifically, none of the e-mails indicate a claim for compensation or include a demand for monetary payment. *See* Colo. Rev. Stat. § 24-10-109(2)(e) (specifying that the notice shall include a "statement of the amount of monetary damages that is being requested"). In addition, the e-mails are more complaints about the University's COVID-19 protocols and process rather than an effort to provide notice that Ms. Lewis would be sued for outrageous conduct.

Ms. Archer also argues that a January 11, 2022 internal complaint regarding the incident to the University through its Office of Equity somehow satisfies the notice requirement. *See* Dkt. #48-8 But that document again fails to give the required notice of a claim for money damages. Indeed, the "remedy" sought in that document was limited to a request that Ms. Lewis be disciplined, for further training for Defendants Klindt and

Cook, and "articulation of new COVID-19 policies since September 3, 2021." Dkt. #48-9 at 2.

Ms. Archer next argues that the CGIA does not apply because making a false report was not part of Ms. Lewis's job duties. If Ms. Lewis were not acting within the scope of her employment when she made the report, the CGIA is not implicated. *See Arabalo v. City of Denver*, No. 11-cv-02343, 2013 WL 10871817, at *4 (D. Colo. Aug. 26, 2013) (explaining that if the complained-of actions were not committed "during the performance of [the public employee's] duties and within the scope of his employment . . . the claims are not subject to the Notice of Claim requirement").

The determination of whether acts or omissions were within the scope of a defendant's employment "depends on an examination of the totality of the circumstances." *Capra v. Tucker*, 857 P.2d 1346, 1348 (Colo. App. 1993) (citing precedent from the context of workers' compensation claims). Factors that courts have examined include the extent to which the injurious action was included within their contract of employment, *see Shandy v. Lunceford*, 886 P.2d 319, 322 (Colo. App. 1994), whether the action "confer[red] a benefit on the employer," *see id.* at 322; *Whale Commc'ns v. Claimants in re Death of Osborn*, 759 P.2d 848, 848 (Colo. App. 1988); *Varsity Contractors and Home Ins. Co. v. Baca*, 709 P.2d 55, 56 (Colo. App. 1985), and whether the action "was required in order to pursue [the defendant's] employer's business." *Capra*, 857 P.2d at 1348–49.

An act occurs within the scope of employment if it is "necessarily incidental to the employment," with the "central inquiry [being] whether the employee is engaged in an activity that bears some relationship to the employer's business." *Gallagher v. Bd. of*

*Trs. for Univ. of N. Colo.*, 18 P.3d 837, 843 (Colo. App. 2002), *rev'd in part on other grounds,* 54 P.3d 386 (Colo. 2002). An act also is within the scope of employment if it occurs pursuant to work the employee does that is "assigned to him [or her] by his [or her] employer ... or is customary in the employer's business." *Podboy v. Fraternal Order of Police*, 94 P.3d 1226, 1230 (Colo. App. 2004); *see also First Nat'l Bank of Durango v. Lyons*, 349 P.3d 1161, 1169 (Colo. App. 2015) (citing *Gallagher* and holding that CGIA does not apply to claims based on misstatements or omissions made in performance of defendants' duties as private developers, outside scope of employment with public entity).

Ms. Lewis is a University employee. Dkt. #21 ¶ 15. University policy required individuals "experiencing coronavirus symptoms . . . [to] self-report" to the University's contract tracing team. *See* Dkt. #21-4 (COVID-19 Testing and Protocols for Reporting Positive COVID-19 Cases in Classrooms and Office Settings). The policy also asks individuals to "*always* self-report if you think you are exposed to someone who has tested positive for COVID-19." *Id.* at 1 (emphasis added). Consistent with this policy, on September 3, 2021, Ms. Lewis reported that she was experiencing symptoms of COVID-19. Dkt. #21 ¶ 28. It is undisputed that Ms. Lewis did not identify Ms. Archer in her initial self-report. Dkt. #21-5. But she did later after specifically being asked the question on a form.

Ms. Archer argues that a false report cannot have been within the scope of Ms. Lewis's employment because no one is expected to lie in connection with her job. *See* Dkt. #48 at 8. The Court disagrees with the premise of this argument. It was the filing of the report that was within the scope of Ms. Lewis's duties as a University employee.

She was specifically instructed, pursuant to the University's COVID-19 protocol, to self-report and answer questions about her potential contacts. The fact that she did this incorrectly (even intentionally incorrectly) does not negate the fact that the self-report was an expected part of her responsibilities under the COVID-19 protocol. *See* Dkt. #21-4 at 1 ("As a reminder, if you are experiencing coronavirus symptoms, have been exposed to coronavirus, or have received a diagnosis of coronavirus, you must <u>self-report</u>.) (emphasis in original).

That an assigned duty was done badly, or incorrectly, or intentionally wrong, does not remove it the scope of the employee's duties within the meaning of the CGIA. *King v. McKillop*, 112 F. Supp. 2d 1214, 1221 (D. Colo. 2000) (concluding that public high school teacher whose alleged negligent supervision of students resulted in a forest fire was entitled to protections of the CGIA because the allegations "relate directly to [his] position as a public school teacher, thereby bringing him within the course and scope of his employment"); *Kliewer By & Through Kliewer v. Sopata*, 797 F. Supp. 1569, 1570 (D. Colo. 1992) (concluding that claims against officer, whose K-9 dog broke out of his yard and attacked the plaintiff while officer was off-duty, were subject to the CGIA because the officer was "required by departmental policy to keep [the dog] at his house"). Here, the allegations relate directly to something Ms. Lewis was required to do as a University employee.

As further example, in *Arabalo*, Judge Marcia S. Krieger dismissed claims against a Denver Sheriff Department employee who was alleged to have made false statements, accusing the plaintiff of embezzling funds. Like in this case, the plaintiff had failed to comply with the CGIA notice requirement and the issue was whether the

allegedly false statements were made "during the performance of [the defendant's] his duties and within the scope of his employment." 2013 WL 10871817, at *5–6. Judge Krieger found the CGIA was implicated because even a false report, when made at the express or implied request of the employer, or if it confers a benefit on the employer, falls within the scope of employment. *Id.* at *6.

The parallel with the instant case is clear. The University expressly instructed its employees to self-report any COVID-19 symptoms and any close contacts. The University benefitted from such self-reports by having contact tracers make the appropriate contacts with implicated individuals and following up to minimize the chance COVID-19 would be spread though the institution. The fact that Ms. Lewis's report was erroneous or even intentionally false does not take the report out of the scope of Ms. Lewis's employment. As Judge Krieger said *Arabalo*, "The accusation was made within the scope of [the defendant's] employment, and thus, Ms. Arabalo's claims against him arising out of that accusation are subject to the procedural requirements of the CGIA." *Id.* at *7.

Thus, case law makes clear that the CGIA applies to Ms. Archer's claim against Ms. Lewis, and Ms. Archer failed to file the requisite notice. The time for her to do so has passed, so she cannot cure this defect. Dismissal of this claim with prejudice is therefore appropriate. *See Carbajal v. St. Anthony Cent. Hosp.*, No. 12–cv–02257–REB–KLM, 2013 WL 4799654, at *5 (D. Colo. Sept. 6, 2013) (adopting recommendation that state law claims be "dismissed with prejudice for failure to comply with the notice requirements of the" CGIA); *Martinez v. El Paso Cnty.*, 673 F. Supp. 1030, 1032 (D. Colo.  1987) ("I find and conclude that the Fourth through Eighth and Tenth and

Eleventh Claims must be dismissed with prejudice as to the plaintiffs . . . for failure to give timely notice as required under § 24–10–109."); *but see Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216–17 (10th. Cir. 2006) (recognizing established rule that "where the district court dismisses for lack of jurisdiction . . . the dismissal must be without prejudice" because a court without jurisdiction lacks power "to make any determination of the merits of the underlying claim").

> ### ii. Plaintiff's tort claim against Ms. Lewis also fails because, even assuming the truth of the allegations, they do not make out a claim for outrageous conduct under Colorado law.

In Colorado, a claim for outrageous conduct, (also referred to as "intentional infliction of emotional distress") has just three elements:

1. The defendant engaged in extreme and outrageous conduct;

2. The defendant did so recklessly or with the intent of causing the plaintiff severe emotional distress; and

3. The defendant's conduct caused the plaintiff severe emotional distress.

*See* Colo. Jury Instr., Civil 23:1; *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970); *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (reciting the tort's definition from the *Restatement (Second) of Torts* § 46 (1965) as, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm").

Under Colorado law, the level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is "extremely high: 'Liability has been found only where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Coors Brewing Co.*, 978 P.2d at 666 (quoting *Restatement (Second) of Torts* § 46 (1965)). "Such outrageous conduct occurs when knowledge of all the facts by a reasonable member of the community would arouse that person's resentment against the defendant and lead that person to conclude that the conduct was extreme and outrageous." Colo. Jury Instr., Civil 23:2 ("Extreme and Outrageous Conduct – Defined"); *see also Christen-Loper v. Bret's Electric, LLC*, 175 F. Supp. 3d 1213, 1226 (D. Colo. 2016) (finding intentional infliction of emotional distress adequately pled against defendant employer where plaintiff was lying in a hospital bed after suffering a severe bipolar episode and under a suicide watch, when defendant, knowing of plaintiff's compromised circumstances, took the opportunity to terminate plaintiff's employment because it was upset with her for taking time off from work to visit her doctor). Per the Colorado case law, a defendant's "conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir. 1988) (applying Colorado law and holding that employer's refusal to offer new positions to 49–year-old employees after their former positions were eliminated did not rise to level of outrageousness necessary to support intentional infliction claim).

"[T]he question of whether conduct is outrageous is generally one of fact to be determined by a jury[.]" *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994). However, the Court has the responsibility "to determine whether reasonable persons could differ on the question." *Id.*; *see also Bauer v. Sw. Denver Mental Health*

*Ctr., Inc.*, 701 P.2d 114, 118 (Colo. App. 1985) (stating, in summary judgment context, "[i]f, after viewing the evidence in the light most favorable to the plaintiff, the court determines that no reasonable person could conclude that the defendant's conduct was outrageous, summary judgment is appropriate"); *Therrien v. United Air Lines, Inc.*, 670 F. Supp. 1517, 1524 (D. Colo. 1987) ("[I]t is for the trial court to determine, in the first instance, whether the conduct could be regarded as sufficiently atrocious to permit recovery.").

Courts have found facts alleged sufficient to sustain a claim for outrageous conduct in a variety of situations. *See, e.g.*, *Pearson v. Kancilia*, 70 P.3d 594 (Colo. App. 2003) (evidence that chiropractor had forced an employee and a patient to have sex with him was sufficient to sustain jury's finding that chiropractor had engaged in outrageous conduct); *Roget v. Grand Pontiac, Inc.*, 5 P.3d 341 (Colo. App. 1999) (reasonable persons could find strong-arming during negotiations, committing fraudulent acts, and falsifying documents outrageous conduct during lease transaction); *Montgomery Ward & Co. v. Andrews*, 736 P.2d 40 (Colo. App. 1987) (seizure of property from business was conducted in manner that could be found outrageous); *Danyew v. Phelps*, 676 P.2d 707 (Colo. App. 1983) (wrongful eviction of tenant without notice while tenant was hospitalized supported a claim for outrageous conduct); *Wing v. JMB Prop. Mgmt. Corp.*, 714 P.2d 916, 918 (Colo. App. 1985) (allegation that plaintiff was sexually harassed by employer, ridiculed, threatened, humiliated, and ultimately fired supported claim for outrageous conduct).

That said, a review of other Colorado cases shows that even fairly egregious conduct has been found not to meet the high standard required for an outrageous

conduct claim. For example, in *Reigel v. SavaSeniorCare, LLC*, 292 P.3d 977 (Colo. App. 2011), the plaintiff asserted a wrongful death action against a nursing home where nursing staff had refused to send its patient, whose spouse was crying for help, to a hospital or doctor for evaluation. Instead, staff stated in a caustic voice, "well, if it was an emergency, we would call an ambulance," responded to spouse's requests "like she was totally overreacting," and allegedly falsified a chart entry related to the deceased's condition. The court found that conduct, "although cold, callous, and lacking sensitivity," was not enough to state an intentional infliction of emotional distress claim under Colorado's high standard. 292 P.3d at 991.

Similarly, in *Gilbert v. United States Olympic Committee*, 423 F. Supp. 3d 1112 (D. Colo. 2019), Judge Christine M. Arguello dismissed a claim for outrageous conduct against the United States Olympic Committee in a case involving alleged human trafficking involving the U.S. taekwondo team. There, an allegation that the Olympic Committee had clothed perpetrators with the legitimacy and authority of Team USA, despite knowing of "their decades-long pattern of serial sexual predation," was too simple and vague to plausibly allege conduct that went "beyond all possible bounds of decency" and that could be regarded as "utterly intolerable in a civilized community." 423 F. Supp. 3d at 1152. *See also Gordon v. Boyles*, 99 P.3d 75, 82 (Colo. App. 2004) (false statements by radio talk show host that a police officer had stabbed a fellow officer, while defamatory, were not sufficiently extreme to meet the standard for outrageous conduct). Another example of bad, even extreme, behavior which failed to meet the high threshold for outrageous conduct is found in *Coors Brewing Co. v. Floyd*, where the Colorado Supreme Court held that allegations that the Coors company had

engaged in an extensive criminal conspiracy involving illegal drugs and money laundering, and then fired the plaintiff to scapegoat him for those crimes, was not enough to meet the "exacting standard." 978 P.2d at 666.

The bottom line is that "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient" to constitute outrageous conduct under Colorado law. *Miales v. McDonald's Rest. of Colo.*, 438 F. Supp. 2d 1297, 1302 (D. Colo. 2006) (quoting *Pearson*, 70 P.3d at 597).

Here, Ms. Archer fails to adequately allege the tort of outrageous conduct. Assuming the truth that Ms. Lewis intentionally falsely reported Ms. Archer as being the source of Ms. Lewis's COVID-19 symptoms for the purpose of disrupting Ms. Archer's preparations for the history celebration, which resulted in Ms. Archer missing an afternoon of work in the office, does not constitute conduct "so outrageous in character, and so extreme in degree," as to go beyond all possible bounds of decency, and "to be regarded utterly intolerable in a civilized community." It is more along the lines of a juvenile prank, which, like an "indignity," a "threat," an "annoyance" or "pretty oppression," was deemed insufficient under *Miales*.

Ms. Archer's relatively calm contemporaneous responses, where she expressed her displeasure at public health decisions being made based on hearsay, and her promise to Ms. Cook to "escalate" the issue, only confirm that while the conduct may have been annoying, insulting, and arguably oppressive, no reasonable jury could conclude that the single episode of conduct by Ms. Lewis was so atrocious and so extreme in degree that it rises to the level of outrageous conduct as recognized under Colorado law.

The Court also has serious doubts whether Ms. Archer's sparse allegations of emotional distress are sufficiently severe to meet the requisite standard under Colorado law. Ms. Archer claims in that that she continues to suffer "emotional distress" from this incident, which is supposedly exacerbated by the University's decision to continue to employ Ms. Lewis. Dkt. #21 ¶ 11. But the allegations of emotional distress are bare and conclusory. It is alleged that Ms. Archer's distress "includes ongoing anxiety, fear of future incidents involving Defendant Lewis, and an inability to change her medication in the manner she desires." *Id.* ¶ 61. These are simply not sufficient plausible allegations of "severe" emotional distress necessary for the tort of outrageous conduct under Colorado law. *See* Colo. Civil Pattern Jury Instructions 23:4 (supported by *Restatement (Second) of Torts* §46 cmt. j (1965)). Under this instruction:

> Severe emotional distress consists of highly unpleasant mental reactions, such as (nervous shock, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry) and is so extreme that no person of ordinary sensibilities could be expected to tolerate and endure it.

Ms. Archer's allegations that, after being falsely accused of spreading COVID-19, she was too upset to return to work over the weekend and continues to suffer from unspecified anxiety, with no other alleged symptoms, simply do not meet this standard.

### 12. Conclusion

For the forgoing reasons, it is hereby **RECOMMENDED** that Defendants' Motions to Dismiss Plaintiff's Second Amended Complaint (Dkt. ##24 and 29) be **GRANTED**, and this lawsuit be **DISMISSED WITH PREJUDICE**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve**

and file specific written objections to the above recommendation with the District

Judge assigned to the case. A party may respond to another party's objections

within fourteen (14) days after being served with a copy. The District Judge need

not consider frivolous, conclusive, or general objections. A party's failure to file

and serve such written, specific objections waives de novo review of the

recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53

(1985), and also waives appellate review of both factual and legal questions.

*Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*,

91 F.3d 1411, 1412-13 (10th Cir. 1996).


Dated:      June 7, 2022
            Denver, Colorado                    _____
                                                N. Reid. Neureiter
                                                United States Magistrate Judge